

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: AURORA FOODS INC., et. al., ) <br> ) <br> Debtor. ) <br> ) <br> ) | |
| ) <br> $R^2$ TOP HAT, LTD., ) <br> ) <br> Appellant, ) <br> ) <br> AURORA FOODS INC. and SEA COAST ) <br> FOODS INC., ) <br> ) <br> Appellees. ) <br> ) | C.A. No. 04-166 GMS |

### MEMORANDUM

**I.  INTRODUCTION**

On December 8, 2003 (the "Petition Date"), Aurora Foods, Inc. ("Aurora") and its subsidiary, Sea Coast Foods, Inc. ("Sea Coast") (collectively, "the debtor") filed voluntary petitions for reorganization relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). On February 20, 2004, over the objection of $R^2$ Top Hat, Ltd. ("$R^2$"), the Bankruptcy Court entered an order (the "Confirmation Order"), confirming Aurora and Sea Coast's First Amended Joint Reorganization Plan (the "Plan"). $R^2$ timely appealed this decision on February 24, 2004.

On January 16, 2004, $R^2$ instituted an adversary proceeding against the debtor in the Bankruptcy Court. Both $R^2$ and the debtor moved for summary judgment in the adversary proceeding. On February 27, 2004, the Bankruptcy Court entered an order granting the debtor's summary judgment motion and dismissing the adversary proceeding. $R^2$ appealed from the order

on March 1, 2004. $R^2$ then filed a motion to consolidate the appeals on April 2, 2004, which the court granted on November 29, 2004.

Presently before the court is $R^2$'s consolidated appeal. The debtor has answered the appeal on the merits, but also contends that the appeal should be dismissed because it is equitably moot. For the reasons that follow, the court will proceed to the merits of $R^2$'s appeal and affirm the decisions of the Bankruptcy Court.

## II. BACKGROUND

### A. Events Leading up to the Debtor's Bankruptcy Filing

On November 1, 1999, the debtor entered into a Credit Agreement with various lenders. (D.I. 21, at 4.) Pursuant to the terms of the Credit Agreement, the lenders provided the debtor with various term loans of $600 million, and a revolving credit line of $175 million. (Id.) According to its terms, modifications or amendments to the Credit Agreement could only be made with the written consent of the Requisite Lenders, provided, however, that any modifications or amendments decreasing the amount of fees payable could only be made by the written consent of all Lenders.[1]

---

[1] Section 10.6A of the Credit Agreement governs amendments and provides that:

No amendment, modification, termination, or waiver of any provision of this Agreement ... shall in any event be effective without the written concurrence of the Requisite Lenders.

Section 10.6A further provides:

[A]ny . . . amendment, modification, termination, waiver or consent which . . . postpones the date on which any interest or any fees are payable; decreases the interest rate borne by any of the loans . . . or the amount of any fees payable hereunder . . . shall be effective only if evidenced by a writing signed by or on behalf of all Lenders to whom are owed Obligations being directly affected by such amendment, modification, termination, waiver, or consent.

2

(D.I. 12, at APP 000135.)

On June 27, 2002, the Credit Agreement was amended (the "June 2002 Amendment") to allow the debtor additional time to make certain principal payments under the agreement, as well as to impose an additional fee called the "Excess Leverage Fee." (D.I. 21, at 5.) The Excess Leverage Fee would be imposed if the debtor failed to make the required payment by September 30, 2003, or committed other events of default. (Id.) This amendment also included an additional pay in kind interest (the "PIK Interest") component.[2]

On February 21, 2003, the Credit Agreement was amended again (the "February 2003 Amendment"). (Id. at 6.) This amendment increased the Excess Leverage Fee from 1.5 percent to 3.5 percent and added a new fee payable. (Id.) The new fee payable, referred to as the "Asset Sale Fee," required the same payment to each of the lenders if the debtor failed to meet certain increased targets of proceeds received from asset sales. (Id.) Additionally, the PIK Interest previously inserted was removed entirely. (Id. at 7.)

---

(D.I. 12, at APP 000135-36.) The Requisite Lenders are defined in Section 1.1 of the Credit Agreement as:

> Non-Defaulting Lenders having or holding not less than 51% of the sum of the aggregate Term Loan Exposure of all Non-Defaulting Lenders plus the aggregate Revolving Loan Exposure of all Non-Defaulting Lenders.

(Id. at APP 000036.)

[2] The PIK Interest clause, found in Section 2.2F, states in pertinent part:

> F.    PIK Interest. Except as otherwise agreed to in writing by the Requisite Lenders, additional pay in kind interest of 1.00% per annum ("PIK Interest") shall accrue on the average daily aggregate amount of each Lender's outstanding Loans and its Revolving Loan Pro Rata Share of the outstanding Letters of Credit.

(Id. at APP 000245.)

On October 13, 2003, the debtor entered into another amendment to the Credit Agreement (the "October 2003 Amendment"). (Id. at 8.) This amendment combined the separate Excess Leverage Fee and the Asset Sale Fee into the "Excess Leverage and Asset Sale Fee," thereby reducing the aggregate amount of each fee. (Id.) The combined fee would be capped at $15 million (an additional forbearance) if payment of all principal, interest, and fees was paid to the senior secured lenders by March 31, 2004. (D.I. 10, at 10.)

## B.   Proceedings in Bankruptcy Court

On December 8, 2003, the debtor filed voluntary petitions for bankruptcy under Chapter 11 of the U.S. Bankruptcy Code, and also filed the Plan.[3] (D.I. 21, at 1.) On January 16, 2004, $R^2$ instituted an adversary proceeding, captioned *$R^2$ Top Hat, Ltd. v. Aurora Foods Inc., and Sea Coast Foods, Inc.*, Adv. Proc No. 04-51338 (MWF), against the debtor. (Id.) Both $R^2$ and the debtor moved for summary judgment in the adversary proceeding.

On February 6, 2004, $R^2$ filed an objection to the confirmation of the debtor's Plan, specifically objecting to the October 2003 Amendment (id. at 11), and arguing that it should be paid its full share of the Excess Leverage Fee, as outlined in the February 2003 Amendment (D.I. 15, at APP 001336).

---

[3] The Plan provides for, among other things: (1) payment in full to the lenders under the Credit Agreement, including $15 million in full satisfaction of the Excess Leverage and Asset Sale Fee; (2) completion of a transaction under which Pinnacle Foods Holding Corporation ("Pinnacle") would be merged into Aurora; (3) an election, whereby holders of Aurora's subordinate notes received either cash in the amount of roughly 46 cents per dollar of debt, or equity in the reorganized company valued at roughly 45 cents per dollar of debt; and (4) an investment in the reorganized company of approximately $85 million by J.W. Childs Equity Partners III, L.P., J.P. Morgan Partners LLC, and C. Dean Metropoulos and Co. (collectively, the "New Equity Investors"). (D.I. 16, at APP 001465-69.) The Plan also provides that there will be no payment of the Excess Leverage or the Asset Sale Fee in excess of the $15 million provided pursuant to the October 2003 Amendment. (Id. at APP 001462.)

The Bankruptcy Court held a confirmation hearing on February 17, 2004. (Id. at 1386-87.) The Bankruptcy Court overruled $R^2$'s objection to confirmation, and subsequently granted the debtor's summary judgment motion and denied $R^2$'s cross motion pending in the adversary proceeding. (Id. at APP 001386-89, APP 001409.) In making its determinations, the Bankruptcy Court concluded that the language in the October 2003 Amendment controlled over the language regarding amendments and modifications contained in the Credit Agreement. (Id. at APP 001387.) In particular, the Bankruptcy Court read the October 2003 Amendment to limit the payment of fees if occurring before March 31, 2004. (Id. at APP 001388.) The Bankruptcy Court then concluded that because payment is occurring under the Plan before March 31, 2004, "the [P]lan adequately provides for payment of that in full." (Id.) Accordingly, the Bankruptcy Court entered the Confirmation Order on February 20, 2004. (D.I. 21, at 1.)

On February 25, 2004, $R^2$ filed a motion to stay the Confirmation Order pending appeal. After conducting a hearing on February 27, 2004 regarding $R^2$'s motion, the Bankruptcy Court denied the motion. (D.I. 17, at APP 001845.)

      **C.**    **Issues Raised on Appeal**

$R^2$ raises two issues on appeal: (1) did the Bankruptcy Court err in granting the debtor's motion for summary judgment and dismissing the adversary proceeding on the basis of its determination not to enforce Section 10.6 of the Credit Agreement; and (2) did the Bankruptcy Court err in confirming the Plan over $R^2$'s objections under 11 U.S.C. § 1129. $R^2$'s appeal boils down to the following argument: the October 2003 Amendment was not effective, because it was not properly consented to and, therefore, the Plan does not provide for sufficient payment of fees due to $R^2$ in accordance with the Credit Agreement, as amended through February 2003. In its reply, the debtor

first argues that R²'s appeal should be dismissed as equitably moot. Additionally, the debtor responds to the merits of R²'s appeal.

## III. DISCUSSION

### A. Equitable Mootness

At the outset, the debtor claims that R²'s appeal is equitably moot. (D.I. 21, at 15.) According to Third Circuit precedent, "[a]n appeal should . . . be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." *In re Continental Airlines*, 91 F.3d 553, 559 (3d Cir. 1996) (quoting *In re Chateaugay Corp.*, 998 F.2d 322, 325 (2d Cir. 1993)). "[W]hen a court can fashion some form of meaningful relief, even if it only partially redresses the grievances of the prevailing party, the appeal is not moot." *Continental Airlines*, 91 F.3d at 558 (internal quotations omitted). A court must consider five factors when "determining whether it would be equitable to reach the merits of a bankruptcy appeal." *Id.* at 560. These include: (1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments. *Id.*

Although the weight accorded to each factor varies depending upon the particular circumstances in the case, "the foremost consideration is whether the reorganization plan has been substantially consummated."[4] *In re Zenith Elecs. Corp. v. Official Comm. of Equity Sec. Holders*,

---

[4]Substantial consummation is defined in the Bankruptcy Code as: "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." 11 U.S.C. § 1101(2).

6

329 F.3d 338, 343 (3d Cir. 2003). This "first factor does not merely entail a formalistic inquiry into whether the plan has been substantially consummated under the definition in the Bankruptcy Code." *Id.* at 343-44. In other words, "satisfaction of [this] . . . definition is [only] a first step in applying this factor." *Id.* at 344.

Here, the debtor relies heavily upon the Third Circuit's finding in *Continental Airlines* that the appeal was equitably moot because . . . the reorganization plan was consummated, no stay was obtained, numerous parties . . . changed their positions, and numerous irrevocable transactions [were] completed as a result of the consummation of the Plan." (D.I. 21, at 16) (internal quotations and citation omitted). Although the Third Circuit made the above-discussed finding in *Continental Airlines*, the court further explained that the "more significant factor for [its] determination that the appeal was equitably moot, . . . was the fact that 'a reversal of the order confirming the Plan likely would put Continental back into bankruptcy.'" *Zenith,* 329 F.3d at 344 (quoting *Continental Airlines*, 91 F.3d at 561). Thus, in *Continental Airlines*, not only was the Plan substantially consummated "in a definitional sense," but it was probable that "granting the appeal would unravel the plan, upon which numerous parties were at that point in reliance."[5,6] *Zenith,* 329 F.3d at 344.

---

[5] In *Continental Airlines*, "the size and intricacy of the plan weighed heavily in the *en banc* Court's determination that the Trustee's appeal was equitably moot." *Zenith* 329 F.3d at 344, n.3. A few of the intricate transactions that had already occurred in *Continental Airlines* included the following: unsecured creditors received distributions; 53 debtors merged with and into Continental; Air Partners and Air Canada invested $110 million dollars in cash in the reorganized Continental; and reorganized Continental assumed $5.0 billion worth of unexpired leases and executory contracts. *Id.*

[6] In *Nordhoff Inv. Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 184 (3d Cir. 2001), the Third Circuit reached a similar conclusion with respect to equitable mootness, when Nordhoff challenged the valuation of Zenith upon which the Bankruptcy Court relied. The Plan was substantially consummated according to the Bankruptcy Code definition. *Id.* at 185. Although not on par with the complexity of the plan in *Continental Airlines*, the *Nordhoff* plan was also

7

Conversely, in the matter of *In re PWS Holding Corp.*, the Third Circuit disagreed with the debtors' opinion that the appeal was equitably moot. *PWS*, 228 F.3d 224 (3d Cir. 2000). There, the court relied upon the *In re Chateaugay Corp.* finding that it was difficult to "conceive how a potential liability of, at most, several million dollars could unravel the Debtor's reorganization, which involved the transfer of billions of dollars, and which . . . resulted in the revival of Debtors into a multibillion dollar operation with $200 million in working capital." *PWS*, 228 F.3d at 236; *see In re Chateaugay Corp.*, 167 B.R. 776, 779 (S.D.N.Y. 1994). In *Chateaugay*, the appellees "made no showing that [the appeal] would 'knock the props out from under the authorization for every transaction that has taken place. . . .'" 167 B.R. at 779. Likewise, in *PWS*, certain releases "could be stricken from the plan without undoing other portions of it," and the appellee sought only "alterations to the plan rather than an unraveling of the reorganization." *PWS*, 228 F.3d at 237-38.

In the present case, the Plan at issue was substantially consummated in a definitional sense on March 19, 2004, when: (1) the New Equity Investors invested approximately $85 million in the reorganized company; (2) reorganized Aurora's merger with Pinnacle closed; (3) Aurora's noteholders received distributions under the Plan; and (4) Aurora's secured lenders were paid. (D.I. 22, at APP 002032.) However, like *PWS* and unlike *Continental Airlines*, the debtor has not offered sufficient evidence that $R^2$'s claim for $6.85 million would effectively unravel this reorganization plan. The Plan required an $85 million investment by the New Equity Investors and, like many

---

"hardly simple," requiring eighteen months of negotiations concerning hundreds of millions of dollars with several parties, and rejuvenating Zenith by restructuring debt, assets, and management. *Id.* at 186. Therefore, "[o]n the ground that the appeal, if successful, would unravel a fairly complicated reorganization plan, the *Nordhoff* Court upheld the District Court's decision that [the] substantial consummation factor favored a finding of equitable mootness." *Zenith*, 329 F.3d at 345.

reorganizations, all parties engaged in sophisticated transactions related to the restructuring. (D.I. 21, at 18.) Beyond this "evidence," the debtor suggests only that the "Plan does not provide for such a payment . . . the time to modify the Plan has passed . . . [and] $R^2$ has not established that the additional fees it seeks for itself will not be due the other [l]enders if the Confirmation Order is reversed." (D.I. 21, at 21.) Like the Bankruptcy Court in its ruling on $R^2$'s motion to stay, this court is equally unconvinced "that the passage of time or the consummation of the plan will make the appeal moot, or that the appellate court could not fashion relief in favor of $R^2$ [] given the fact that based on the debtor's projection after the merger the debtor will be in a much stronger position than it currently is. . . ." (D.I. 17, APP 001845.)

In making its finding, the court recognizes that this reorganization involved costly, sophisticated transactions, and "was heavily negotiated between all the parties. . . ." (D.I. 15, at APP 001256.) Aurora, however, is valued "at a little more than $930 million" (D.I. 15, at APP 001311), and projections show positive growth in net income, shareholders' equity, and cash flow from operations for the four years post confirmation. (D.I. 15, at APP 001277.) According to the projected cash flow statement, the reorganized company will be paying down debt in the exact amount equal to the cash flow from operations plus the cash flow from investment activities for the projected four years. (D.I. 15, at APP 001321.) There is, however, a provision for a revolver to the reorganized company, which is north of $100 million. (D.I. 15, at APP 001322.) Given the projected strength of the debtor following reorganization, the court concludes that the Plan need not be undone to satisfy a $6.85 million contested payment.

9

Accordingly, the court finds that the majority of the five factors for equitable mootness weigh heavily in favor of allowing R²'s appeal to proceed. Although, under the Bankruptcy Code definition, the plan has been substantially consummated, it is unlikely that a $6.85 million claim will unravel a $930 million reorganization plan for the aforementioned reasons. In addition, the fact that R² attempted but failed to obtain a stay is not dispositive, especially when taking into account the fact that the Bankruptcy Court, in denying the stay, stated that it did not believe that consummation of the Plan would make R²'s appeal moot. (D.I. 17, at APP 001845.) R² filed notice of appeal soon after each Bankruptcy Court proceeding, and the debtor was on notice (as were other creditors) that the Bankruptcy Court's Confirmation Order could be overturned on appeal.[7] Further, even if the appeal succeeds, the court is not persuaded that any relief requested will impair the success of the debtor's reorganization. As impairment of the Plan is unlikely, there is no perceived harm to the public interest in promoting and assisting the debtor in a successful reorganization by final judgments if the Bankruptcy Court decision is overturned. Therefore, the court concludes that R²'s appeal may proceed. The court now turns to the merits of R²'s appeal.

---

[7] Additionally, the court concludes that the debtor's concern that the door will be opened to potential claims of other unidentified lenders, once R²'s appeal is allowed to proceed, is unfounded. *See In re Heartland Wireless Communications, Inc.*, Nos. 98-2692, 01-500-SLR, 2002 WL 31319460, at * 2 (D. Del. Sept. 23, 2002) (citing *PWS* for the proposition that a creditor who had opportunity to contest language in the debtor's plan of reorganization, which provided for the extinguishment of any fraudulent transfer claims that might be asserted on the creditor's behalf, and whose objections to plan confirmation were overruled in a plan confirmation order from which he had not appealed, was barred by the confirmed plan from later seeking to prosecute a fraudulent transfer claim in state court).

### B.     $R^2$'s Appeal

On appeal, $R^2$ contests two of the Bankruptcy Court's rulings concerning the October 2003 Amendment. $R^2$ contends that the Bankruptcy Court erred in granting the debtor's motion for summary judgment and dismissing the adversary proceeding on the basis of its determination that the October 2003 Amendment, rather than Section 10.6 of the Credit Agreement, was controlling. $R^2$ also contends that the Bankruptcy Court erred in confirming the Plan over its objections under 11 U.S.C. § 1129.

"In reviewing a case on appeal, the Bankruptcy Court's factual determinations will not be set aside unless they are clearly erroneous." *See Mellon Bank, N.A. v. Metro Comm., Inc.*, 945 F.2d 635, 641 (3d Cir. 1991), *cert. denied*, 503 U.S. 937 (1992). Conversely, a Bankruptcy Court's conclusions of law are subject to plenary review. *See id.*, at 641-42. Mixed questions of law and fact are subject to a "mixed standard of review." *See id.* at 641-42. Under this "mixed standard of review" the appellate court accepts findings of "historical or narrative facts unless clearly erroneous, but exercise[s] plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to historical facts." *Id.*

After reviewing the decision of the Bankruptcy Court under a mixed standard of review, the court finds that the Bankruptcy Court properly confirmed the debtor's Plan and properly granted the debtor's motion for summary judgment. As previously mentioned, the main issue underlying this consolidated appeal is whether the October 2003 Amendment to the original Credit Agreement is valid. If the October 2003 Amendment is valid, it effectively decreases the amount of lender consent necessary to reduce the Excess Leverage and Asset Sale Fee owed to lenders, like $R^2$, from "All

Lenders" to the "Requisite Lenders," i.e. a majority of lenders. $R^2$ contends that Section 10.6 of the Credit Agreement controls, while the debtor contends that the October 2003 Amendment controls.[8]

The court agrees with the Bankruptcy Court that this decision concerns which provision may be classified as specific, and which provision may be classified as general. If both general and specific provisions address the same subject matter, under New York law,[9] specific provisions control over general provisions. *See In re Marvel Entm't Group*, 274 B.R. 99, 107 (D. Del. 2002) (interpreting agreement governed by New York law); *Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D.2d 191 (N.Y. App. Div. 1995). When "interpreting a contract, courts should look to the contract as a whole and should not adopt an interpretation that will render a provision superfluous or without

---

[8] For its claim, $R^2$ relies upon Section 10.6A, which in pertinent part provides:

> any . . . amendment, modification, termination, waiver or consent which . . . postpones the date on which any interest or any fees are payable; decreases the interest rate borne by any of the Loans . . . or the amount of any fees payable hereunder . . . shall be effective only if evidenced by a writing signed by or on behalf of all Lenders to whom are owed Obligations being directly affected by such amendment, modification, termination, waiver or consent.

(D.I. 12, at APP 000135-36.) Conversely, the debtor relies upon the October 2003 Amendment to the Credit Agreement which provides:

> C.   <u>Excess Leverage and Asset Sale Fee</u>. Except as otherwise agreed to in writing by the Requisite Lenders, Company shall pay each Lender a fee (the "Excess Leverage and Asset Sale Fee") equal to 5.25% . . . provided that such Excess Leverage and Asset Sale Fee shall be reduced to $ 15,000,000 with the remainder forgiven if . . . the payment in full . . . of all Obligations, including the Excess Leverage and Asset Sale Fee, occurs on or prior to March 31, 2004. . . .

(D.I. 13, at APP 000447.)

[9] Pursuant to Section 10.15 of the Credit Agreement, New York law governs the construction and enforcement of the agreement without regard to conflicts of law principles. (D.I. 12, at APP 000139.)

12

force." *See Marvel*, 274 B.R. at 107. "[A] construction that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation." *Id.* (internal quotations omitted).

Here, avoiding a result that would render the October 2003 Amendment without force, the Bankruptcy Court gave effect to both Section 10.6 and the October 2003 Amendment. In other words, the Bankruptcy Court determined that Section 10.6 and the October 2003 Amendment could be read in harmony. The Bankruptcy Court further found that "the [October 2003] [A]mendment is more specific as to this specific fee [the Excess Leverage and Asset Sale Fee], and therefore, it could be agreed to in writing only by the [R]equisite [L]enders [a majority] rather than all lenders."[10] (D.I. 15, APP 001387.) Given that the specific language of October 2003 Amendment controls, the general language of Section 10.6 does not apply to the Excess Leverage and Asset Sale Fee that $R^2$ disputes. (Id.) Seeing no error in the Bankruptcy Court's findings, the court hereby adopts them.

The court further adopts the Bankruptcy Court's finding that the parties' prior course of performance demonstrates that they understood the Credit Agreement could be modified by a majority of lenders, as opposed to all of the lenders. When interpreting a contract, "the parties' course of performance . . . is relevant to understanding the contract even if the contract is unambiguous." *United Fire & Cas. Co. v. Arkwright Mut. Ins.*, 53 F. Supp. 2d 632, 640-41

---

[10] $R^2$ recommends that any tension between Section 10.6 and the October 2003 Amendment must be resolved against the debtor as drafters of the Credit Agreement. (D.I. 10, at 25.) "[A]mbiguities in a contractual instrument will be resolved . . . against the party who prepared or presented it." *Lynn v. Purcell*, 812 N.Y.S.2d. 760, 763 (N.Y. Sup. Ct. Nassau Cty. 2005); *see also, Jacobson v. Sassower*, 489 N.E.2d 1283, 1284 (N.Y. 1985). $R^2$'s argument is moot, however, due to the court's finding that the Credit Agreement and the October 2003 Amendment can be read in harmony.

13

(S.D.N.Y. 1999) (citations omitted). "An interpretation of the contract in practice, prior to litigation, can constitute evidence of the parties' intent." *Id.* at 641. Here, two amendments were executed prior to the October 2003 Amendment – the June 2002 Amendment and the February 2003 Amendment. The June 2002 Amendment provided for the Excess Leverage Fee, encompassing a provision that the Requisite Lenders could agree in writing to modify the Excess Leverage Fee. (D.I. 12, at APP 000245.) Additionally, the June 2002 Amendment included the PIK Interest provision, which could be modified upon agreement in writing by the Requisite Lenders. (D.I. 12, at APP 000245). The February 2003 Amendment, which $R^2$ seeks to enforce, added the "Asset Sale Fee" and deleted the PIK Interest. (D.I. 12, at APP 000346-48.) The Bankruptcy Court determined that "by agreeing to the added fee . . . the [R]equisite [L]enders agree[d] that it could be modified by the [R]equisite [L]enders in any manner." (D.I. 15, at APP 001387.) The Bankruptcy Court also found that the PIK Interest provision was significant because it "was added and taken away solely by the [R]equisite [L]enders and not by all lenders, and [it] had similar language and was similarly an addition or amendment to the . . . original [C]redit [A]greement." (D.I. 15, at APP 001387.) Through their actions, it is evident to the court (as it was to the Bankruptcy Court) that the parties understood "that [the Credit Agreement] could be modified, even reduced, by the majority or [R]equisite [L]enders rather than by all lenders." (D.I. 15, at APP 001388.) Therefore, the court will affirm the Bankruptcy Court's ruling.

Finally, $R^2$ contends that the Plan violates the "best interests" test of 11 U.S.C. § 1129(a)(7). (D.I. 24, at 15.) "To measure value [under the best interest test], the Court must contrive a hypothetical chapter 7 liquidation conducted on the effective date of the plan." *In re Lason,* 300 B.R. 227, 232 (D. Del. 2003) (citation omitted). Further, "section 1129(a)(7)(A) requires a

14

determination whether a 'prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'" *Id.* After having reviewed the Bankruptcy Court's analysis with respect to "the best interest test," the court agrees that "in looking at 1129(a)(7) the liquidation analysis must assume and compare what the creditors are receiving on the effective date under the [P]lan and what they would receive if there were a liquidation on the effective date, and . . . it is clear that the [P]lan pays the same amount." (D.I. 15, at APP 001387.) This finding is based upon the court's previous conclusions that the October 2003 Amendment is specific to the fee at issue and valid pursuant to the approval of the Requisite Lenders. The court finds no reason to deviate from the Bankruptcy Court's conclusion. Accordingly, the debtor has satisfied the best interest test, given that the amount received by creditors is equal under both reorganization and liquidation.

Dated: December 19, 2006

UNITED STATES DISTRICT JUDGE